UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, On Behalf of Itself and All Others Similarly Situated, | ) ) ) | No. 3:25-cv-02394 |
| | ) | |
| Plaintiff, | ) ) | Judge |
| | ) | |
| vs. | ) ) | CLASS ACTION |
| | ) | |
| SIX FLAGS ENTERTAINMENT CORPORATION, RICHARD A. ZIMMERMAN, SELIM BASSOUL, GARY MICK, LOUIS CARR, MICHELLE FRYMIRE, DANIEL HANRAHAN, CHIEH HUANG, JENNIFER MASON, ENRIQUE RAMIREZ MENA, D. SCOTT OLIVET, ARIK RUCHIM, and MARILYN SPIEGEL, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
murray@mmmb.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT J. ROBBINS
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
rrobbins@rgrdlaw.com

Plaintiff City of Livonia Employees' Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Six Flags Entertainment Corporation f/k/a CopperSteel HoldCo, Inc. (referred to herein as "CopperSteel" pre-merger and "Six Flags" or the "Company" post-merger), Company press releases, earning calls, analyst reports, and media reports about the Company and its legacy businesses.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities who purchased or acquired Six Flags common stock pursuant or traceable to the Company's registration statement and prospectus issued in connection with the July 1, 2024 merger of legacy Six Flags Entertainment Corporation ("Legacy Six Flags") with Cedar Fair, L.P. ("Cedar Fair"), and their subsidiaries and affiliates.[1]  Cedar Fair and Legacy Six Flags combined two amusement park behemoths in a "merger of equals" to create North America's largest regional amusement park operator with a property portfolio of approximately 40 amusement parks and water parks, along with several resort properties (the "Merger").

---

[1]      Although both named Six Flags Entertainment Corporation, Six Flags and Legacy Six Flags are separate companies, SEC registrants, and stock issuers.  For ease of reference, plaintiff refers herein to the combined Company after the Merger as "Six Flags" and the entity that merged with Cedar Fair in the Merger as "Legacy Six Flags."

2.      Plaintiff asserts claims pursuant to §§11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77o.  These claims are based on strict liability and negligence, and not on knowing or reckless conduct by or on behalf of defendants.  Such claims neither allege nor sound in fraud, and plaintiff disclaims any allegations of fraud, scienter, or recklessness in connection with such non-fraud claims.

3.      In early 2020, the emergence of coronavirus SARS-CoV-2 led to a global health pandemic and the spread of COVID-19, a highly contagious illness.  The COVID-19 pandemic proved immensely disruptive to the amusement park industry.  For example, many governments implemented travel restrictions, stay-at-home orders, social distancing requirements, and other measures designed to mitigate the spread of the disease.  Amusement park attendance plummeted, and several amusement park operators – including Legacy Six Flags and Cedar Fair – were forced to close their parks for extended periods of time.

4.      To guide Legacy Six Flags through the company's post-pandemic reopening and recovery, in February 2021 Legacy Six Flags elevated board member Selim Bassoul ("Bassoul") to the position of Non-Executive Chairman and, in November 2021, to Chief Executive Officer ("CEO").  As CEO, Bassoul overhauled Legacy Six Flags' corporate strategy, jettisoning a pre-pandemic "transformation plan" in favor of a new plan "focused on building sustainable growth" based around three core initiatives: (i) resetting to a performance-oriented culture; (ii) reorienting to a park-centric organizational mindset; and (iii) resetting strategy and operational priorities to focus on "premiumization."  Legacy Six Flags' 2021 annual report stated that this strategic plan "will focus on the guest experience, pricing and capital allocation to reinvest in the business and pay down debt" and feature "improv[ed] . . . product offerings and . . . a premium guest experience," which would purportedly be achieved by offering guests "different ticket offerings,

higher pricing, enhancing guest amenities and food and beverage offerings, and being disciplined with costs."

5.      In the years following, Legacy Six Flags and its executives claimed to be investing in a "premium" guest experience that purportedly justified higher ticket prices. During a February 24, 2022 earnings call, Bassoul described the change in approach as follows: "Through premiumization, we are focused on guests who are willing to pay more for a premium experience which will lessen the crowding of our parks, reducing pressure on operations and elevating the guest experience." Legacy Six Flags' then-Chief Financial Officer ("CFO"), Sandeep Reddy, similarly stated: "Looking ahead, we expect our premiumization strategy to depend less on total attendance and more on total revenue and profit as we focus on more premium guests."

6.      As a result of Legacy Six Flags' purported premiumization strategy, the company's admissions revenue per capita increased 25% year-over-year during its fiscal 2022, which Legacy Six Flags primarily attributed to higher realized prices on season pass and single-day tickets and the reduction of promotions.[2] Legacy Six Flags similarly attributed an 18% increase in 2022 in-park revenue per capita to "the benefits of our revenue management initiatives and in-park initiatives to improve the guest experience." While Legacy Six Flags' operating expenses declined 9% during its fiscal 2022, the company attributed this decline primarily to "lower labor expenditures at the parks due to a reduction in operating days and more efficient labor scheduling," rather than any disinvestment initiatives. Emphasizing the point, Legacy Six Flags' 2022 annual report claimed that the company was "delivering long-term, profitable growth by continuously enhancing the guest experience and by operating efficiently," which included as a core tenet "[u]pgrading all aspects of our parks and experiences for our guests and our employees."

---

[2]     Legacy Six Flags' fiscal year ended on the Sunday closest to December 31. Consequently, Legacy Six Flags' 2022 fiscal year ended on January 1, 2023.

7.      On every subsequent quarterly conference call prior to the Merger, Bassoul highlighted the "upgrades" and transformational investments that Legacy Six Flags was purportedly making throughout its park operations and that ostensibly justified recent price hikes and the Company's shift to premium product branding, stating, *inter alia*:

(a)      May 12, 2022 1Q22 Earnings Call: "[E]verything is going to go up and the value is going to go up. *And we're investing in the small park the same way we're investing in the big park. We're doing the beautification of all our smaller parks. We're doing all the work we're doing in our water parks across board. We're doing all that restaurant – restroom and restaurant upgrade and food upgrade in all our parks. So I think we're going to see people willing to pay more to be in our parks*."

(b)      November 10, 2022 3Q22 Earnings Call: "So what are the big bets we have made as a company? First, *we bet that we could upgrade the park experience by investing in our infrastructure and employee friendliness and by lowering attendance to create an extraordinary value proposition that will allow us to grow revenue by raising prices in line with value we provide. . . . We continue to enhance our guest amenities and park infrastructure, prioritizing the comfort of our guests*. Improvements such as new front gates, additional benches and shaded areas, cleaner bathrooms, upgraded restaurants, additional water park cabanas and overall beautification of parks with more flowers and greeneries have helped increase guest satisfaction."

(c)      March 2, 2023 4Q22 Earnings Call: "*Our first priority is to improve park experiences for both our guests and our employees. The investments we are making in 2023 prioritize guest comfort by focusing on areas that directly impact the time spent in the parks, including safety, cleanliness, food quality and variety, speed of service, guest amenities and technology*. We are updating and modernizing our park infrastructure, including new VIP lounges, water park cabanas and new shaded water park seating, more shade structures and benches throughout our parks and in general park beautification effort with more flowers and greenery."

(d)      May 8, 2023 1Q23 Earnings Call: "Our parks were underinvested in terms of infrastructure, technology and guest amenities. Today, we are pushing more events and more interactive family initiatives to getting our guests to spend longer time in our parks and to increase season pass holders visitations per year. As the world's largest thrill and regional theme park company, *we are back adding more exciting rides to our theme parks and water parks. We have increased the annual CapEx budget for the company to a record number in 2023, 2024 and 2025. We are investing in our park to become more kids and family friendly. We are boosting our R&D on technology. We are increasing our marketing and media spend in 2023 to promote all those initiatives*."

(e)     August 10, 2023 2Q23 Earnings Call: "*[O]ur guests are responding favorably to the investments we have made in our parks*, in our new seasonal events and in technology, including our new mobile app."

8.     On November 2, 2023, Legacy Six Flags and Cedar Fair announced a blockbuster agreement "to combine in a merger of equals" to create the largest amusement park operator in North America, with an $8 billion pro forma enterprise value.  In a joint press release issued that day, the companies lauded the purported benefits of the proposed Merger, which included combining complimentary park portfolios, the achievement of substantial operational efficiencies (leading to an estimated $200 million in annual cost synergies), improved guest experiences, a robust financial profile, and strong cash flow generation of over $800 million annually "to facilitate investments in park upgrades, expansions and new, innovative offerings."  The release claimed the combination would produce almost immediate benefits and be accretive to earnings per share within 12 months of closing.

9.     Also on November 2, 2023, executives from Legacy Six Flags and Cedar Fair held a joint conference call with investors and analysts to discuss the Merger as well as their respective companies' 3Q23 financial performance.  Legacy Six Flags' recently appointed CFO, Gary Mick ("Mick"), kicked off his presentation by focusing on the significant recent investments purportedly made by the company, stating in pertinent part:

> *This was a quarter focused on investment*.  We made great strides in improving our guest experience by investing in our digital transformation, events, shows, food and beverage and new entertainment.  We made intentional and deliberate decisions to try new things including introducing new shows designed to cater to a multigenerational audience, enhanced fireworks displays and state-of-the-art trunk shows, testing and promoting speedy gates, automated toll plazas, launching our first-ever water park festival as well as introducing a water float parade in our Texas theme park that experienced record-breaking heat this summer.

10.     Bassoul similarly began his prepared remarks by highlighting the purportedly "incredible" transformation that Legacy Six Flags had undergone during his tenure to improve the guest experience, stating in pertinent part:

I'm excited because this combination starts and ends with the guests.  If you've known me, and look at my track record.  I have – I am customer obsessed.  Thanks to the dedicated and resilient team at Six Flags, ***we have made incredible progress in the past 2 years.  Our transformation has been grounded in instilling a guest-obsessed culture and harnessing what makes our parks so special to deliver an exceptional guest experience***.  This transaction is all about our guests.  The value it would create for them, the additional perks we will provide and the additional thrills we will create not only locally but regionally.

11.     Bassoul further highlighted the significant cash flow generation and cost savings that would purportedly be achieved through the Merger, which he claimed "will allow us to quickly delever while also deploying capital strategically into our business to enhance performance."  Later in the call, Bassoul elaborated on the purported rationale for the deal, claiming that Legacy Six Flags was "almost finished with our transformation" and in a current position to monetize on its prior investments, a process which he claimed would be accelerated by the increased cash flows and cost savings derived from the Merger, stating in pertinent part:

Let's talk about why now.  Neither one of the companies needed to do the deal we were not coerced to the deal.  ***I can tell you on Six Flags, we had just almost finished with our transformation***, and you're starting seeing attendance coming up double digit despite weather this summer, how fall sales is basically setting the 2024 very, very well.  However, we believe truly that this merger creates a successful amusement park operator in the highly competitive leisure space with an expanded and diversified footprint, a more robust operating model and strong revenue and cash flow generation.

***I tell you, over the past 2 years, we have taken significant steps to transform our operations and create a more agile business while investing in new offerings to delight and excite our guests***.  I know that Richard and Brian and their team were earlier than us doing all the what I call elevating the experience.  So we're trying to catch up to this combination build on our momentum but making sure that we create a geographic footprint that is expected to mitigate the impact of seasonality and reduced earnings volatility.

Combining our complementary operating capabilities and technology portfolio will help us create a platform for Richard and Brian to improve our park offerings and more efficient system-wide performance.  I will tell you what I love about Cedar Fair is they were delivering a more engaging and immersive guest experience than we've ever done.  And that's something we need to take to our guests.

And finally, ***I think increasing and bolstering our free cash flow will increase flexibility to invest in new rides and attraction[s], broader food and***

- 6 -

*beverage selection, additional in-park offering and cross-park initiative. And then from our side, we are bringing a lot of technologies that are starting to unveil in this fourth quarter and 2024, specifically to make our guests easier to do business with us, all of which will be successfully deployed to grow attendance, increase per capita spending and improve profitability. I will tell you there are a lot of monetizing initiatives that we are both excited about that are coming in, in 2024.*

12.     On December 22, 2023, Six Flags filed with the SEC a Form S-4 registration statement for the Merger, which, after several amendments, was declared effective on January 31, 2024.  Also on January 31, 2024, the Company filed with the SEC a joint proxy statement and prospectus for the Merger on Form 424B3, which incorporated and formed part of the registration statement (the registration statement, all amendments thereto and documents incorporated therein, and joint proxy statement and prospectus for the Merger are referred to herein as the "Registration Statement").

13.     On March 12, 2024, Legacy Six Flags shareholders voted to approve the Merger at a special meeting of shareholders.  Because Cedar Fair unit holders would receive a majority equity stake in the combined Company, no vote of Cedar Fair unit holders was required to approve the Merger and no such vote was held.

14.     The Merger closed on July 1, 2024.  In connection with the Merger, Legacy Six Flags and Cedar Fair created and jointly owned a new entity, CopperSteel HoldCo, Inc. ("CopperSteel").  In a series of transactions, Legacy Six Flags and Cedar Fair ultimately merged with and into CopperSteel, which became the surviving corporation.  All shareholders of Legacy Six Flags and unit holders of Cedar Fair received CopperSteel common stock in connection with the Merger, with the holders of Cedar Fair units owning approximately 51.2% and the holders of Legacy Six Flags common stock owning approximately 48.8% of the outstanding shares of Six Flags immediately after closing.  While Cedar Fair unit holders received no cash consideration in the deal, Legacy Six Flags shareholders collectively received an additional $128 million in the

form of a special dividend.  Following the Merger, CopperSteel changed its name to Six Flags and listed its shares on the New York Stock Exchange ("NYSE") under the ticker symbol "FUN." Bassoul became the Executive Chairman of Six Flags, while Cedar Fair's CEO Richard A. Zimmerman ("Zimmerman") became the combined Company's CEO.

15.    The Registration Statement for the Merger was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement failed to disclose that, notwithstanding its executives' claims that the company had pursued transformational investment initiatives in the years leading up to the Merger, Legacy Six Flags in fact suffered from chronic underinvestment and its parks required millions of dollars in additional capital and operational expenditures above the company's historical cost trends in order to maintain (let alone grow) Legacy Six Flags' share in the intensely competitive amusement park market.  Prior to the Merger, Legacy Six Flags had for years deferred or foregone basic park maintenance, operational improvements, infrastructure repairs, and ride design and development updates.  Additionally, after taking over as CEO in November 2021, Bassoul slashed employee headcount in an effort to cut costs, but in so doing had degraded the company's operational competence and guest experience.  In short, at the time of the Merger Legacy Six Flags required a massive, undisclosed capital infusion to turn the company around, and these acute capital needs undermined the entire rationale for the deal as portrayed in the Registration Statement.

16.    Based on the true state of Legacy Six Flags' business, the purported benefits of the Merger represented in the Registration Statement – including purported increases in revenue, earnings, and cash flow at the combined Company, and the ability to de-lever the business while simultaneously increasing park investments – were not remotely achievable and lacked any factual

basis.  Instead, the Merger placed Six Flags in a vicious cycle, as the combined Company could not generate sufficient earnings and cash flow to make the necessary investments in Legacy Six Flags parks given the Company's debt commitments, leading to degraded earnings and cash flow, and ultimately the imposition of severe capital constraints and diminished investment capacity.

17.     Shortly after the Merger, Six Flags disclosed unexpected cost increases attributable to Legacy Six Flags assets.  On November 6, 2024, Six Flags issued a press release reporting results for its fiscal third quarter ended September 29, 2024 – the first quarterly results of the combined Company.  The release stated the Company had $894 million in total operating costs and expenses during the quarter, an increase of $427 million compared to the prior year period primarily due to the addition of Legacy Six Flags properties.

18.     During the related 3Q24 earnings call, CFO Brian Witherow ("Witherow") stated the Company expected to "invest between $500 million and $525 million in . . . capital expenditures in both 2025 and 2026," which was "necessary to accelerate the integration process and begin to activate the growth potential of the combined portfolio."  CEO Zimmerman similarly highlighted the need for significant capital expenditures to drive Six Flags' operational and financial results and achieve Merger objectives, stating: "Our ability to successfully grow attendance and improve guest spending levels next year will be driven in large part by our compelling capital program."  Zimmerman characterized "strategically investing capital to drive growth, consistent reinvestment in our parks and underlying infrastructure" as "essential for creating long term value."

19.     During the question-and-answer portion of the call, Citi analyst James Hardiman ("Hardiman") asked about the "[o]bviously" surprising capital needs of Legacy Six Flags that had only come to light after the Merger, stating in pertinent part:

> Obviously, if you look at sort of the performance of stock since, since the merger closed, ***it seems like there's been somewhat of a shifting narrative and talking to***

*investors, I think that narrative seems to be that you guys were surprised by A, the lack of investments that had been being made at the Six Flags Parks and then B, that the level of investment that would be required to sort of begin that turnaround was much greater than you originally anticipated*.

20.     On February 27, 2025, Six Flags issued a press release reporting results for its fiscal fourth quarter and year ended December 31, 2024.  The release stated that during the quarter Six Flags' operating costs and expenses totaled $523 million, an increase of $217 million compared to 4Q23, primarily attributable to Legacy Six Flags' operations during the period.  The release also provided Six Flags' 2025 adjusted EBITDA guidance of $1.08 billion to $1.12 billion, exclusive of any portfolio optimization efforts.

21.     During the Company's February 27, 2025 earnings call, Witherow disclosed that the Company was lowering its planned 2025 capital expenditures to a range of $475 million to $500 million, which he acknowledged included "some level of investment on deferred items at the legacy Six Flags parks."

22.     On May 8, 2025, Six Flags issued a press release reporting results for its fiscal first quarter ended March 30, 2025.  The release stated that during the quarter operating costs and expenses totaled $412 million, an increase of $197 million compared to 1Q24, which were primarily the result of Legacy Six Flags' operations during the period.  The release stated net loss attributable to the combined Company totaled $220 million, which included $134 million of net loss from Legacy Six Flags' operations.

23.     On the 1Q25 earnings call, Truist Securities analyst Michael Swartz ("Swartz") pressed management to explain why the "rate of EBITDA decline was up . . . nearly triple what it was last year" for Legacy Six Flags' operations.  In response, Witherow conceded that this sudden erosion in earnings was directly attributable to the investment needs of Legacy Six Flags parks, stating in pertinent part:

Yeah, Mike, so I think if you look at, the two sides of the portfolio, we certainly with the [Legacy Six Flags] side of our portfolio, the Six Flags parks, more of those opening up earlier, *we invested and it's a big chunk of the timing difference I mentioned on the cost side. I'd say more of it is happening from the cost side as we brought forward a lot of off-season. Whether you want to call it maintenance or pre-opening costs, we brought a lot of those from a timing perspective earlier in the year here in 2025, and so that's a bigger part of the equation on our Six Flags side of the portfolio*.

24.     Deutsche Bank Securities analyst Chris Woronka ("Woronka") picked up the line of questioning, asking about "the maintenance stuff you're working on at Six Flags with respect to, lighting and, the little things . . . [t]hat had kind of gone undone over the years" and whether these costs had been factored into the Company's infrastructure improvement plans. Zimmerman demurred on the details, but admitted that "the list is always long" for needed improvements at the parks.

25.     On May 20, 2025, Six Flags held an Investor Day during which the Company discussed its long-term operational and financial targets and corporate initiatives. Zimmerman began the call by admitting that the Company's "leverage is higher than certainly I would like" but stated that Six Flags planned to "generate free cash flow that we can reinvest in the business but also pay down debt that will let us reduce our leverage to below 4 times by the end of 2026." During his prepared remarks, Witherow stated that to grow attendance and achieve cash flow generation Six Flags intended to reinvest in the business 12% to 13% of its net revenue – far higher than the high single-digit historical reinvestment rate of Legacy Six Flags.

26.     During the question-and-answer portion of the call, Six Flags' Director of Investor Relations, Michael Russell ("Russell"), observed that "the legacy Six Flags portfolio is kind of the focus" for the Company's planned capital expenditure increases. Six Flags' Chief Strategy Officer, Christian Dieckmann ("Dieckmann"), confirmed: "Yes, [Legacy Six Flags parks are] going to get a significant share of it . . . ." Russell followed by noting that Legacy Six Flags' historical capital expenditure rate "was more like 9 to 10[%]" of net revenues and asked whether

there is a "point where the Six Flags attractions catch up to the Cedar Fair, why couldn't we get back to something like 9% to 10% of revenues?"  He continued by asking whether this increase reflected a "structural change" in the business.  Zimmerman responded that the planned increase in expenditures simply reflected what "we need to do [for] . . . infrastructure" and "according to what we can drive in terms of the attendance."

27.     Then, on August 6, 2025, Six Flags issued a press release reporting catastrophic results for its fiscal second quarter ended June 29, 2025.  During the quarter, Six Flags generated quarterly net revenue of just $930 million and adjusted EBITDA of $243 million – both figures well below consensus estimates of $982 million net revenue and $352 million adjusted EBITDA, respectively.  The release slashed expected 2025 adjusted EBITDA to a range of $860 million to $910 million, a $215 million (or 20%) reduction at the midpoint.  The release further revealed that the Company's debt-to-earnings leverage ratio had ballooned to 6.2x, causing Six Flags to consider the "divestiture of non-core assets" and to reduce its projected annual capital expenditures to $400 million, a 20% cut.  The release also stated that Six Flags was "reassess[ing]" the long-term guidance the Company had given barely two months prior.

28.     While Six Flags attempted to blame the "weather" for the abysmal results and guidance reductions, several analysts found that explanation unconvincing, instead focusing on rising costs and the inability of the Company to achieve the Merger benefits represented in the Registration Statement.

29.     In the wake of Six Flags' disastrous financial and operational results following the Merger, the Company has announced that the two primary architects of the combination – defendants Bassoul and Zimmerman – were stepping down from their positions.

30.     On the Merger closing date, July 1, 2024, Six Flags stock traded above $55 per share.  The price of Six Flags stock subsequently fell as low as $20 per share, a nearly 64% decline.

As of the date of this complaint the price of Six Flags stock has not recovered, causing plaintiff and other Class members (defined below) who acquired shares in or traceable the Merger to suffer hundreds of millions of dollars in economic losses and damages under the federal securities laws.

## JURISDICTION AND VENUE

31. This Court has jurisdiction over the claims asserted in this complaint pursuant to §22 of the Securities Act, 15 U.S.C. §77v.

32. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the Securities Act because many of the acts and practices complained of herein occurred in substantial part in this District, defendants are found or transact substantial business in this District, Six Flags maintains significant operations in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District, including the preparation and issuance of the Registration Statement. Prior to the Merger, Cedar Fair maintained its headquarters in this District.

## PARTIES

33. Plaintiff City of Livonia Employees' Retirement System acquired Six Flags common stock pursuant or traceable to the Registration Statement for the Merger, as stated in the certification attached hereto and incorporated herein by reference, and suffered damages as a result.

34. Defendant Six Flags Entertainment Corporation is an amusement park operator with flagship properties located within this District, as well as significant finance and administrative operations in this District. Cedar Fair was headquartered in this District prior to the Merger at One Cedar Point Drive, Sandusky, Ohio 44870.

35. Defendant Richard A. Zimmerman served as the President, CEO, and a director of Six Flags beginning on July 1, 2024, the date the Merger closed, and was named to these positions in the Registration Statement. Prior to becoming the President and CEO of Six Flags, Zimmerman served as the President and CEO of Cedar Fair. On August 6, 2025, Six Flags announced that

- 13 -

Zimmerman was unexpectedly resigning as President and CEO, and that the Company had not identified Zimmerman's replacement.

36.     Defendant Selim Bassoul served as the Executive Chairman of the Board of Directors ("Board") of Six Flags beginning on July 1, 2024 – the date the Merger closed.  Bassoul served as President and CEO of Legacy Six Flags and, before that, its Non-Executive Chairman prior to the Merger.  Bassoul received tens of millions of dollars' worth of personal financial remuneration in connection with the Merger in addition to the pro rata benefits he shared in common with other Legacy Six Flags shareholders.  The Registration Statement estimated the total potential cash and equity value of the personal, Merger-related payments to Bassoul at approximately $36.5 million.  On October 10, 2025, Six Flags announced that Bassoul was unexpectedly leaving his position as Executive Chairman.

37.     Defendant Gary Mick served as the CFO of Legacy Six Flags and, upon consummation of the Merger, became the Chief Integration Officer of Six Flags.  Defendant Mick received millions of dollars' worth of personal financial remuneration in connection with the Merger in addition to the pro rata benefits he shared in common with other Legacy Six Flags shareholders.  The Registration Statement estimated the total potential cash and equity value of the personal, Merger-related payments to defendant Mick at approximately $6.6 million.

38.     Defendant Louis Carr ("Carr") served as a director of the Company at the time of the Merger.

39.     Defendant Michelle Frymire ("Frymire") served as a director of the Company at the time of the Merger.

40.     Defendant Daniel Hanrahan ("Hanrahan") served as a director of the Company at the time of the Merger.

41.     Defendant Chieh Huang ("Huang") served as a director of the Company at the time of the Merger.

42.     Defendant Jennifer Mason ("Mason") served as a director of the Company at the time of the Merger.

43.     Defendant Enrique Ramirez Mena ("Mena") served as a director of the Company at the time of the Merger.

44.     Defendant D. Scott Olivet ("Olivet") served as a director of the Company at the time of the Merger.

45.     Defendant Arik Ruchim ("Ruchim") served as a director of the Company at the time of the Merger.

46.     Defendant Marilyn Spiegel ("Spiegel") served as a director of the Company at the time of the Merger.

47.     Defendants Zimmerman, Bassoul, Mick, Carr, Frymire, Hanrahan, Huang, Mason, Mena, Olivet, Ruchim, and Spiegel are sometimes referred to collectively herein as the "Individual Defendants."  Each of the Individual Defendants other than defendant Mick were named with their consent as a director of Six Flags in the Registration Statement.  Defendants Bassoul and Mick signed the Registration Statement.

48.     As directors, executive officers, and/or major shareholders of the Company, each of the Individual Defendants participated in the solicitation and sale of Six Flags common stock in connection with the Merger for their own benefit and the benefit of Six Flags.  The Individual Defendants were key members of the Merger working group and the executives and directors of Legacy Six Flags and Cedar Fair who solicited investors to purchase the common stock sold in the Merger.

49. Six Flags and the Individual Defendants are sometimes referred to collectively herein as "defendants."

## BACKGROUND

50. Legacy Six Flags' first park opened in 1961 in Arlington, Texas. The company expanded by buying local theme parks across the United States, ultimately becoming one of the largest regional amusement park operators in the world and the largest operator of water parks in North America. The company's parks generally offer a selection of thrill rides, water attractions, themed areas, concerts, and shows. In 2009, Legacy Six Flags filed for bankruptcy as it collapsed under the weight of its debt load, emerging a year later under bondholder ownership. Legacy Six Flags recovered over time, and its stock price climbed throughout the 2010s, peaking at over $70 per share in 2018 before COVID-19 related disruptions.

51. Cedar Fair can be traced back to the 1870s when its flagship park, Cedar Point, opened in Sandusky, Ohio, on the shores of Lake Erie. Cedar Fair went public in 1987, after which it expanded its portfolio of parks by buying various family owned parks such as Knott's Berry Farm in Buena Park, California. Unlike Legacy Six Flags parks, Cedar Fair's parks do not operate under a single namesake brand. Rather, all of the parks maintain carefully curated identities, giving guests unique, park-specific experiences. Given its strong regional brands and reputation for excellent park maintenance and focus on the guest experience, Cedar Fair parks traditionally have a passionate and loyal fan base.

52. In 2021, in the wake of COVID-19 disruptions to the amusement park industry, Bassoul took over as Legacy Six Flags' Non-Executive Chairman and then CEO. Under his leadership, in 2022 Legacy Six Flags embarked on a "premiumization" plan, seeking to drive ticket prices higher and increase customer spending by purportedly investing in park upgrades and improvements. In 2022, Bassoul complained that Legacy Six Flags had turned into "cheap day

- 16 -

care centers" for teenagers and said the company wanted to "migrate . . . a little bit from what I call the Kmart, Walmart to maybe the Target customer."  To accomplish Bassoul's vision, Legacy Six Flags raised the average price of admission to $35.99 from $28.73, leading to the company's admissions revenue per capita increasing 25% year-over-year during its fiscal 2022.

53.     In 2023, Legacy Six Flags claimed to be undertaking several investment initiatives, including upgrading its parks' ambience, focusing on things like re-painting buildings, planting more flowers, adding trash cans, and providing cleaner bathrooms and more shady seating to attract visitors.  Legacy Six Flags also purportedly increased investments in food and food equipment and the addition of new and exciting rides to attract higher-tier consumers and increase in-park spending.  During Legacy Six Flags' 1Q23 earnings call earnings, Bassoul described these investments in pertinent part:

> Today, we are pushing more events and more interactive family initiatives to getting our guests to spend longer time in our parks and to increase season pass holders visitations per year.  As the world's largest thrill and regional theme park company, *we are back adding more exciting rides to our theme parks and water parks*.
>
> *We have increased the annual CapEx budget for the company to a record number in 2023, 2024 and 2025.  We are investing in our park to become more kids and family friendly.  We are boosting our R&D on technology.  We are increasing our marketing and media spend in 2023 to promote all those initiatives*.

54.     On November 2, 2023, Legacy Six Flags issued a press release announcing it had entered into a definitive merger agreement to combine with Cedar Fair in a "merger of equals." The Merger was seen as a positive jolt for Legacy Six Flags and Cedar Fair, with the combined company poised to benefit from increased scale, a bigger geographical footprint that would insulate it from seasonal volatility and weather impacts, combined food and beverage programs, and the sharing of an expanded intellectual property portfolio.  With two combined revenue streams, the Merger was portrayed as a way for the company to quickly deliver from its high debt load while simultaneously enjoying synergies and deploying increased cash flows to invest in

- 17 -

parks, rides, and other capital improvements. The release stated that the Merger was expected to achieve $120 million in cost synergies over two years and $80 million in new revenue synergies within three years, leading to enhanced cash flows and substantial debt reduction. The release further stated that the combined company was expected leverage ratio of 3.7x net debt to adjusted EBITDA, "with a path to reduce the leverage to approximately 3.0x within two years of transaction close."

55.     The release announced that Cedar Fair's CEO, Zimmerman, would be CEO of the combined company and that Legacy Six Flags' CEO, Bassoul, would be Executive Chairman of the Board. Witherow, CFO of Cedar Fair, would serve as the CFO of the post-Merger Company, while Mick, CFO of Legacy Six Flags, would become its Chief Integration Officer.

56.     On the morning of November 2, 2023, Legacy Six Flags and Cedar Fair hosted a joint "merger of equals" conference call to discuss their respective financial results for 3Q23 as well as the Merger, with Cedar Fair represented by Zimmerman and Witherow, and Legacy Six Flags represented by Bassoul and Mick. When Bassoul spoke, he discussed the value the Merger would ostensibly create for shareholders and the combined company's ability to quickly de-lever its business, stating in pertinent part:

> This starts with our expected annual synergies of $200 million, which we have been – which have been fully divested. We are confident we can achieve these in the next three years and create significant value along the way.
>
> ***In addition, this combination de-risks our businesses in many ways in terms of leverage, weather and the regional mix of our portfolio***. We will operate an expanded and complementary portfolio of 42 amusement and water parks, 9 resort properties and other entertainment experiences that our guests love. Our expanded footprint will reduce dependency on any one park or any one region, providing us more earnings stability and allowing us to offer more exciting options to guests.
>
> ***Our free cash flow generation will allow us to quickly delever while also deploying capital strategically into our business to enhance performance***. Importantly, this merger will also allow us to grow our new company into a global brand with our IP. Our combined season pass and loyalty programs will make this

deal even sweeter for our most loyal guests providing enhanced access and additional perks.

57.     Following Bassoul's prepared remarks, Zimmerman similarly claimed the Merger would "unlock considerable upside opportunity for our shareholders" and that the Company would "utilize enhanced cash flow generation to delever down to our target ratio of 3.0x with additional flexibility to invest in our growth initiatives and drive shareholder returns."

58.     As the call continued, Witherow discussed the "compelling . . . financial benefits" of the Merger for the combined company, stating that the combined company's "diversified footprint will improve performance consistency with a broader scope of locations and offerings to mitigate weather-related and seasonal earnings volatility."  Witherow further stated the Company "expect[ed] to have a combined leverage ratio of approximately 3.7x reflecting expected synergies and enhanced cash flow generation.  But we have outlined a clear path to reduce that to approximately 3x within the first 2 years."  He added: "Following the close of the transaction, we will prioritize delevering to hit our target leverage ratio and ensure we are maintaining a robust capital structure" as "our first priority."

59.     During the question-and-answer portion, Zimmerman was asked to describe "the assets and the CapEx maybe at the Six Flags parks that you'd expect to put in . . . the maintenance that . . . those assets necessarily need?"  In response, Zimmerman equated Legacy Six Flags to Cedar Fair, stating: "These are irreplaceable assets that have incredible value to sustain cash flow – revenue generation, cash flow generation over time."  Zimmerman stated there were "always" opportunities to make improvements "on both sides to continue to improve our sites, improve our parks," indicating that there were no extraordinary, undisclosed capital needs at Legacy Six Flags or that were fundamentally different than existed at Cedar Fair, but simply the ever-present desire to make improvements as existed with any amusement park.

- 19 -

60.     On November 17, 2023 and November 20, 2023, the Premerger Notification Office of the Federal Trade Commission ("FTC") accepted the premerger notification and report forms under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act") submitted by Legacy Six Flags and Cedar Fair, respectively.

61.     On December 20, 2023, Legacy Six Flags and Cedar Fair withdrew their respective premerger notification and report forms under the HSR Act and refiled them on December 21, 2023.

62.     On January 22, 2024, Legacy Six Flags and Cedar Fair each received a request for additional information and documentary materials (a "Second Request") from the U.S. Department of Justice ("DOJ") in connection with the DOJ's review of the Merger.  The effect of a Second Request was to extend the waiting period imposed by the HSR Act, until 30 days after each of Legacy Six Flags and Cedar Fair has substantially complied with the Second Request, unless that period was extended voluntarily by the parties or terminated earlier by the DOJ.  Per the terms of the Merger, Cedar Fair and Legacy Six Flags were required to use their reasonable best efforts to certify substantial compliance with the Second Request on or before May 2, 2024.

63.     During the pendency of this antitrust review, on May 9, 2024, Legacy Six Flags reported its 1Q24 results.  In the press release, Bassoul stated the 2024 season was "'off to a promising start, with 2024 season pass sales through April increasing by double-digits compared to last year, pre-booked group sales approaching pre-pandemic levels, and our park beautification and technology initiatives resonating strongly with our guests'" and that Legacy Six Flags would "'launch many thrilling new rides, attractions, and immersive experiences in time for the peak summer season.'"  On the related earnings call, Bassoul stated the company was "nearly 3 years into [its] transformation" with results "trending upward" as a result of the company's successful "premiumization" plan.

64.     On March 12, 2024, Legacy Six Flags shareholders voted to approve the Merger at a special meeting of shareholders.  Because Cedar Fair unit holders would receive a majority equity stake in the combined company, no vote of Cedar Fair unit holders was required to approve the Merger and no such vote was held.

65.     On June 26, 2024, Cedar Fair and Legacy Six Flags jointly announced that the DOJ's regulatory conditions for their Merger had been met, "permitting the companies to proceed with the closing" of the Merger.  As would later be revealed *after* the Merger, due to this antitrust review, Cedar Fair was prevented from conducting ordinary due diligence of Legacy Six Flags.  As Witherow later acknowledged during the Company's May 20, 2025 Investor Day: "I keep saying this, until 3 days before the transaction because of the DOJ review process, I couldn't see any of the data."

66.     Pursuant to the Merger, Cedar Fair unit holders received one share of Six Flags common stock for each Cedar Fair unit they owned, while Legacy Six Flags stockholders received 0.58 shares of Six Flags common stock for each Legacy Six Flags share they owned, plus a cash payment via a special dividend that ultimately totaled approximately $128 million.[3]  Immediately following the Merger, holders of Cedar Fair units owned 51.2% of equity in the combined Company, while the holders of Legacy Six Flags common stock owned 48.8%.

67.     The Merger closed on July 1, 2024.  On that date, the price of Six Flags stock peaked at over $55 per share.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

68.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements

---

[3]     Both Cedar Fair unit holders and Legacy Six Flags shareholders also received cash in lieu of any fractional shares of Six Flags common stock.

contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

69.     The Registration Statement stated: "Six Flags and Cedar Fair believe there are significant benefits and synergies that may be realized through leveraging the workforce, scale and guest engagement of Six Flags and Cedar Fair."   The Registration Statement detailed these purported Merger "benefits," which included "enabl[ing] cost reductions" and creating a "stronger balance sheet," stating in pertinent part:

> *Among other benefits, members of the Six Flags Board noted that the potential transaction would . . . enable cost reductions and create a company with a stronger balance sheet.  Members of Six Flags senior management and the Six Flags Board further discussed potential cost and revenue uplift of the potential transaction and the likelihood and timeline for achievement of such synergies.*

70.     The Registration Statement detailed an October 20, 2023 special meeting of the Legacy Six Flags Board that further described the purported strategic benefits of the Merger, stating in pertinent part:

> Members of Six Flags senior management discussed with the Six Flags Board the potential strategic benefits that could result from the potential transaction, including that the potential transaction would create (i) a combined company with expanded and diversified experiences for guests, (ii) *a stronger balance sheet enabling increased investment and improved guest experiences*, (iii) a larger geographical footprint, which would mitigate weather-related seasonality, *and (iv) the opportunity to achieve synergies, which Six Flags and Cedar Fair management estimated could reach or exceed $200 million annually by 2027, and the ability of the combined company to achieve such strategic benefits.*

71.     The Registration Statement also conveyed the company's confidence in the "Strategic Considerations and Synergies" that would result from the Merger, which included the following:

> •    the expectation *that the Mergers will generate total annual synergies of approximately $200 million, including approximately $120 million of administrative and operational cost savings and synergies*, which are expected to be realized within two years following the Closing, and *approximately $80 million in incremental EBITDA from revenue uplift, which is expected to be realized within three years following the Closing*;

- the expectation that *the Mergers will result in a combined company with a strong balance sheet, enabling the combined company to reduce its leverage ratio from approximately 3.7x net debt to CopperSteel Adjusted EBITDA (on a pro forma basis over the last twelve months through the third quarter of 2023, inclusive of synergy realization) to approximately 3.0x net debt to CopperSteel Adjusted EBITDA (inclusive of synergy realization) within two years of the Closing*;

- that the Mergers will result in a combined company that would have generated $3.4 billion in revenue, $1.2 billion in CopperSteel Adjusted EBITDA and $826 million of free cash flows on a pro forma basis over the last twelve months through the third quarter of 2023 (assuming expected annual synergies of $200 million) and the belief that *the combined company's free cash flows will provide it with flexibility to invest in new rides and attractions, broader food and beverage selections, additional in-park offerings, and cross-park initiatives, such as consumer technology and enhanced guest services, which investments are expected to grow attendance, increase per capita spending and improve profitability while enhancing guests' value and experience across the park portfolio*;

- the expectation that *the Mergers will be accretive to adjusted earnings per share for Six Flags Stockholders within twelve months following the Closing*; [and]

- the belief that *the combined company will be able to leverage Cedar Fair's recent park investments experience to accelerate the transformation underway across Six Flags' portfolio*[.]

72.     In the Registration Statement, Legacy Six Flags highlighted the purported

investments that the company had made in its park operations leading up to the Merger, stating in

pertinent part:

> *We regularly make capital investments for new rides and attractions in our parks.  In addition, we make capital investments in the food, retail and other in-park areas.  We also make enhancements to theming and landscaping of our parks in order to provide a more complete, family-oriented entertainment experience; and invest in our information technology infrastructure to attain operational efficiencies.   We regularly perform maintenance capital enhancements*, with most expenditures made during the off-season.  Repairs and maintenance costs for recurring and routine maintenance are expensed as incurred and are not included in capital expenditures.

73.     The Registration Statement similarly claimed that Legacy Six Flags was on firm

financial footing and able to cover its existing capital expenditure and other cost needs through

existing cash and credit sources, stating in pertinent part:

- 23 -

*Based on historical and anticipated future operating results, we believe cash flow from operations, available cash and amounts available under our Revolving Credit Facility will be adequate to meet our liquidity needs, including any anticipated requirements for working capital, capital expenditures, scheduled debt service and obligations* under arrangements relating to the Partnership Parks.

74.     The statements in ¶¶69-73 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the Merger:

(a)     that Legacy Six Flags had underinvested in its parks and operations, deferring or foregoing basic park maintenance, operational improvements, infrastructure repairs, and ride design and development for several years prior to the Merger;

(b)     that Legacy Six Flags needed to make millions of dollars' worth of undisclosed capital and operational expenditures above the company's historical cost trends in order to maintain or grow Legacy Six Flags' share in the intensely competitive amusement park market;

(c)     that, due to the massive, undisclosed capital needs of Legacy Six Flags and the deleterious effects of years of chronic disinvestment by the company, the revenue, earnings, cash flow, capital and operational investments, cost reductions, balance sheet improvements, and debt reduction plans presented to investors in the Registration Statement were not reasonably achievable or rooted in facts existing at the time of the Merger; and

(d)     that, as a result of (a)-(c) above, the ostensible rationale for the Merger and its purported benefits lacked any reasonable factual basis.

75.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii), required the Registration Statement to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a

discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

76.     The failure of the Registration Statement to disclose the facts listed in ¶74 violated 17 C.F.R. §229.303(b)(2)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  This failure also violated 17 C.F.R. §229.105 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Six Flags stock speculative or risky.

**Post-Merger Events**

77.     On November 6, 2024, Six Flags issued a press release reporting results for its fiscal third quarter ended September 29, 2024 – the first quarterly results of the combined Company. The press release stated the Company had $894 million in total operating costs and expenses during the quarter, an increase of $427 million compared to the prior year period primarily due to the addition of Legacy Six Flags properties.

78.     During the related 3Q24 earnings call, Witherow stated the Company expected to "invest between $500 million and $525 million in . . . capital expenditures in both 2025 and 2026," which was "necessary to accelerate the integration process and begin to activate the growth potential of the combined portfolio."  Zimmerman similarly highlighted the need for significant capital expenditures to drive Six Flags' operational and financial results and achieve Merger objectives, stating: "Our ability to successfully grow attendance and improve guest spending levels next year will be driven in large part by our compelling capital program."  Zimmerman characterized "strategically investing capital to drive growth, consistent reinvestment in our parks and underlying infrastructure" as "essential for creating long term value."

79. During the question-and-answer portion of the call, analyst Hardiman asked about the "[o]bviously" surprising capital needs of Legacy Six Flags that had come to light after the Merger, stating in pertinent part:

> Obviously, if you look at sort of the performance of stock since, since the merger closed, *it seems like there's been somewhat of a shifting narrative and talking to investors, I think that narrative seems to be that you guys were surprised by A, the lack of investments that had been being made at the Six Flags Parks and then B, that the level of investment that would be required to sort of begin that turnaround was much greater than you originally anticipated*.

80. On November 14, 2024, Six Flags announced a $1 billion investment plan to "enhance the guest experience."  The investments were slated to include new rides, attractions, themed areas, dining upgrades, and technology enhancements across the Company's 42 parks.

81. On February 27, 2025, Six Flags issued a press release reporting results for its fiscal fourth quarter and year ended December 31, 2024.  The press release stated that during the quarter Six Flags' operating costs and expenses totaled $523 million, an increase of $217 million compared to 4Q23, primarily attributable to Legacy Six Flags' operations during the period.  The press release also provided Six Flags' 2025 adjusted EBITDA guidance of $1.08 billion to $1.12 billion, exclusive of any portfolio optimization efforts.

82. During the fourth quarter and full year 2024 earnings call, Witherow disclosed that the Company was lowering its planned 2025 capital expenditures to a range of $475 million to $500 million, which he acknowledged included "some level of investment on deferred items at the legacy Six Flags parks."

83. On May 1, 2025, Six Flags issued a press release announcing plans to close Six Flags America and its companion water park, Hurricane Harbor, in Bowie, Maryland after the 2025 season.

84. On May 8, 2025, Six Flags issued a press release reporting results for its fiscal first quarter ended March 30, 2025.  The press release stated that during the quarter operating costs and

expenses totaled $412 million, an increase of $197 million compared to 1Q24, which were primarily the result of Legacy Six Flags' operations during the period. The press release stated net loss attributable to the combined Company totaled $220 million, which included $134 million of net loss from Legacy Six Flags' operations.

85.    On the 1Q25 earnings call, analyst Swartz pressed management to explain why the "rate of EBITDA decline was up . . . nearly triple what it was last year" for Legacy Six Flags' operations. In response, Witherow conceded that the sudden erosion in earnings was directly attributable to the investment needs of Legacy Six Flags parks, stating in pertinent part:

> Yeah, Mike, so I think if you look at, the two sides of the portfolio, we certainly with the six side of our portfolio, the Six Flags parks, more of those opening up earlier, **we invested and it's a big chunk of the timing difference I mentioned on the cost side. I'd say more of it is happening from the cost side as we brought forward a lot of off-season. Whether you want to call it maintenance or pre-opening costs, we brought a lot of those from a timing perspective earlier in the year here in 2025, and so that's a bigger part of the equation on our Six Flags side of the portfolio**.

86.    Analyst Woronka picked up the line of questioning, asking about "the maintenance stuff you're working on at Six Flags with respect to, lighting and, the little things . . . [t]hat had kind of gone undone over the years" and whether these costs had been factored into the Company's infrastructure improvement plans. Zimmerman demurred on the details, but admitted that "the list is always long" for needed improvements at the parks.

87.    On May 20, 2025, Six Flags held an Investor Day during which the Company discussed its long-term operational and financial targets and corporate initiatives. Zimmerman began the call by admitting that the Company's "leverage is higher than certainly I would like" but stated that Six Flags planned to "generate free cash flow that we can reinvest in the business but also pay down debt that will let us reduce our leverage to below 4 times by the end of 2026." During his prepared remarks, Witherow stated that to grow attendance and achieve cash flow

generation Six Flags intended to reinvest in the business 12% to 13% of its net revenue – far higher than the high single-digit historical reinvestment rate of Legacy Six Flags.

88.     During the question-and-answer portion of the call, Russell, Six Flags' Director of Investor Relations, observed that "the legacy Six Flags portfolio is kind of the focus" for the Company's planned capital expenditure increases.  Dieckmann, Six Flags' Chief Strategy Officer, confirmed: "Yes, [Legacy Six Flags parks are] going to get a significant share of it . . . ."  Russell followed by noting that Legacy Six Flags' historical capital expenditure rate "was more like 9 to 10[%]" of net revenues and asked whether there is a "point where the Six Flags attractions catch up to the Cedar Fair, why couldn't we get back to something like 9% to 10% of revenues?"  He continued by asking whether this increase reflected a "structural change" in the business. Zimmerman responded that the planned increase in expenditures simply reflected what "we need to do [for] . . . infrastructure" and "according to what we can drive in terms of the attendance."

89.     On May 23, 2025, Six Flags announced it was firing all 27 park presidents, and that the roles would not be filled because the Company was moving to a "regional operating structure" to centralize certain functions and responsibilities at the corporate level.  The leadership layoffs were part of a 10% staff reduction in full-time employees across the Company.

90.     On August 6, 2025, Six Flags issued a press release reporting catastrophic results for its fiscal second quarter ended June 29, 2025.  During the quarter, Six Flags achieved quarterly net revenue of just $930 million and adjusted EBITDA of $243 million – both figures well below consensus estimates of $982 million net revenue and $352 million adjusted EBITDA, respectively. The press release slashed expected 2025 adjusted EBITDA to a range of $860 million to $910 million, a $215 million (or 20%) reduction at the midpoint.  The press release further revealed that the Company's debt-to-earnings leverage ratio had ballooned to 6.2x, causing Six Flags to consider the "divestiture of non-core assets" and to reduce its projected annual capital expenditures to $400

million, a 20% cut.  The release also stated that Six Flags was "reassess[ing]" the long-term guidance the Company had given barely two months prior.

91.     While Six Flags attempted to blame the "weather" for the abysmal results and guidance reductions, during the 2Q25 earnings call several analysts found that explanation unconvincing.   For example, Stifel, Nicolaus & Company analyst Steven Wieczynski ("Wieczynski") began the question-and-answer portion of the call in pertinent part:

> I guess to start, ***I'm kind of confused in terms of your macro pressure comments***. When you refer to macro pressures, are you referring to weather?
>
> Or are you indicating that you've seen a material change in customer spending patterns because of macro fears which aren't weather-related.  ***I just can't figure out what you guys are referring to, whether headwinds make sense to us***.

92.     When Zimmerman and Witherow attempted to explain the Company's position, Wieczynski pushed back, stating it was "confus[ing]" for ephemeral weather conditions to have such a drastic impact to the Company's long-term guidance, stating in pertinent part:

> But ***wondering why that would have such a material impact on these goals that were kind of put in place for three years out***?
>
> And maybe saying that a little bit differently.  ***I would have thought your '28 targets would have embedded some pretty significant unperfect weather macro headwinds***, something along those lines that would still kind of allow you to get close to that $1.5 billion target.  So I'm not sure if maybe you guys are kind of walking that target back now given the change with Richard and the new CEO coming, ***I guess I'm just a little bit confused there***.

93.     Later in the call, analyst Hardiman focused on the surprise jump in expenses in the quarter, which the Company had noted included a $25 million "pull forward," stating that "when I sort of back out the $25 million of cost that you've laid out, it seems like a lot of growth in terms of operating expenses."

94.     Mizuho Securities analyst Ben Chaiken ("Chaiken") followed up on this line of inquiry, pressing the Company to explain the unexpected first half cost increases and failure to

lower projected costs for the remainder of the year despite the purported weather-related park closures (which should have lowered costs), stating in pertinent part:

> Maybe just a clarification on – maybe just a clarification on costs. ***I don't totally f[ollow] the variables***. So I guess your guide prior to this quarter was for cash cost to be down [3%], it's kind of like what we were talking about on 1Q, but then attendance was materially lower with incremental part closures.

> I think you kind of suggested the prepared remarks somewhere around 30 incremental park closure days year over year. ***So why is minus 3% still the right answer? Shouldn't that be an opportunity for cost to be much lower***?

> *     *     *

> I guess ***I'm just trying to figure out if the parks were not even open. Like what's the offset if there's – again, these are round numbers, but 30 incremental part closure days, where is – can you help us with the offset of what are the costs went up maybe that are keeping you at that minus 3%***?

95.     During the call, Jefferies analyst David Katz again focused on Six Flags' costs and capital needs, asking whether it was "fair that we should think about much of what's occurred within the [Legacy Six Flags] parks more so than the Cedar Fair legacy park, the implication that those have maybe turned out to be a bit of a different animal than what was expected."

96.     Goldman Sachs analyst Lizzie Dove followed up on these remarks by tying the lack of pre-Merger investment in Legacy Six Flags parks to the sudden erosion in profitability, stating in pertinent part:

> And then just to kind of follow up on David's question a little bit on the legacy Six parks. ***The tenant decline was somewhat similar at legacy Six than legacy Cedar, but the EBITDA result or the pressure was a lot worse at legacy Six. I think the margins are about 16%. And so I'm curious just like how you think about like reinvestment needs in those parks. And how kind of quickly those kind of initiatives can kind of come through over the next few years***?

97.     Management's responses failed to quell investor questions and concerns, which centered on the problematic state of the Legacy Six Flags assets and the implications for the Company's business and prospects. In an analyst note issued on August 6, 2025, Chaiken stated Six Flags' attempts to blame weather for the disappointing results "doesn't make any sense."

- 30 -

Rather, he stated the "largest concern/criticism over the years" revolved "around expenses" and, in particular, the Company's "ability to move/operate dynamically, particularly around costs." Chaiken observed that the cost concern was "on full display today" with the revelation of significant cost pull forwards into the quarter and failure to decrease planned expenses despite more park closure dates. In a separate analyst note issued that same day, Chaiken called the Legacy Six Flags' results "baffling," noting Legacy Six Flags' revenue fell 11% and its adjusted EBITDA collapsed over 55% during the quarter.

98.     An August 6, 2025 analyst report by Barclays similarly concluded that the unexpected increase in costs during the quarter "proves that the 2Q weakness was more than just weather." The report noted that Six Flags' 2Q25 results lapped its 2Q24 results, which had also suffered from "extreme weather and hurricane impacts," casting further doubt on the Company's proffered explanation. The report concluded that Six Flags' "credibility is low."

99.     On August 14, 2025, credit-rating company S&P Global Ratings downgraded Six Flags to a BB- rating, saying its debt levels were too high relative to earnings and that the recent attendance issues were expected to delay de-leveraging efforts.

100.     Numerous media outlets reported on the surprising demise of Six Flags following the Merger. For example, an August 31, 2025 article on *Cleveland.com* entitled "What's next for Six Flags? Cedar Point parent faces park sell-off, possible bankruptcy" cited several analysts and market observers who opined that Six Flags would need to engage in substantial asset sales to improve its financial condition. Dennis Speigel, an industry consultant, stated: "'If I were running the company, there are 10 to 12 parks I would keep, pay off debt and start over . . . I wouldn't be surprised if you see the company on the precipice of bankruptcy to get that debt off the books.'" He added: "'I think their due diligence on this merger was just too fast . . . . They overpromised and underdelivered.'" Analyst Hardiman was quoted in the article as noting: "'It's about the

biggest miss I've ever seen in the theme park industry versus expectations.'" He also reportedly shared his "belie[f] that perhaps Cedar Fair executives underestimated how deeply troubled the legacy Six Flags parks are."

101.    In the wake of Six Flags' disastrous financial and operational results following the Merger, the Company has announced that the two primary architects of the combination – defendants Bassoul and Zimmerman – were stepping down from their positions.

102.    On the Merger closing date, July 1, 2024, Six Flags stock traded above $55 per share. The price of Six Flags stock subsequently fell as low as $20 per share, a nearly 64% decline. As of the date of this complaint, the price of Six Flags stock has not recovered, causing plaintiff and other Class members who acquired shares in or traceable the Merger to suffer hundreds of millions of dollars in economic losses and damages under the federal securities laws.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of plaintiff and all persons who purchased Six Flags common stock pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are defendants, members of their immediate families, and officers and directors of Six Flags and their immediate families.

104.    The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable. Six Flags common stock trades on the NYSE under the ticker symbol "FUN" and tens of millions of shares were issued in the Merger. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Six Flags or its transfer agent and may be notified of the pendency of

this action by mail, using the form of notice similar to that customarily used in securities class actions.

105.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

106.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

107.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' acts and omissions as alleged in this complaint violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact or omitted material information required to be stated therein; and

(c)     whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

108.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §11 of the Securities Act
### Against All Defendants

109.    Plaintiff repeats and realleges ¶¶1-108 by reference.

110.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

111.    This Count does not sound in fraud.  Plaintiff does not allege that any of the defendants engaged in intentional or reckless misconduct or acted with fraudulent intent.

112.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

113.    Six Flags is the registrant and issuer for the common stock issued in the Merger. As issuer of the common stock, Six Flags is strictly liable to plaintiff and the Class for the misstatements and omissions in the Registration Statement.

114.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

115.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

116.    By reason of the conduct alleged herein, each of the defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

117.    Plaintiff acquired Six Flags common stock pursuant and traceable to the Registration Statement.

118.     Plaintiff and the Class have sustained damages.  The value of Six Flags common stock has declined substantially subsequent to and due to defendants' violations of the Securities Act.

119.     At the time of their purchases and acquisitions of Six Flags common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the Securities Act
### Against Six Flags and the Individual Defendants

120.     Plaintiff repeats and realleges ¶¶1-119 by reference.

121.     This Count is brought pursuant to §15 of the Securities Act against Six Flags and the Individual Defendants.

122.     The Individual Defendants each were control persons of Six Flags by virtue of their positions as directors, senior officers, and/or authorized representatives of Six Flags.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Six Flags and/or Cedar Fair.  The Company controlled the Individual Defendants and all of its employees.

123.     Six Flags and the Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the

process that allowed the issuance of Six Flags common stock in the Merger to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, designating plaintiff as Lead Plaintiff under the Private Securities Litigation Act of 1995, and appointing plaintiff's counsel as Lead Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 5, 2025              MURRAY MURPHY MOUL + BASIL LLP
                                      JOSEPH F. MURRAY


                                          s/ Joseph F. Murray
                                      _____
                                      JOSEPH F. MURRAY (Ohio Bar #0063373)

                                      1114 Dublin Road
                                      Columbus, OH  43215
                                      Telephone:  614/488-0400
                                      614/488-0401 (fax)
                                      murray@mmmb.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
ROBERT J. ROBBINS
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com

VANOVERBEKE, MICHAUD &
   TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

City of Livonia Employees' Retirement System ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___3___ day of ___November___ , 2025.

City of Livonia Employees' Retirement System

By: _____

Its: ___Chairperson___

SIX FLAGS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/02/2024 | 943 | $54.12 |
| 07/02/2024 | 1,076 | $54.11 |
| 10/10/2024 | 263 | $36.66 |
| 10/10/2024 | 972 | $36.42 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 08/08/2025 | 521 | $24.64 |
| 08/08/2025 | 553 | $24.20 |
| 08/08/2025 | 2,180 | $23.85 |

Prices listed are rounded up to two decimal places.